AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>ALL FUNDS IN TWO BANK ACCOUNTS<br>HELD AT RENASANT BANK PURSUANT<br>TO 18 U.S.C. 981 | )<br>)<br>)  Case No.   20-sz-29<br>)<br>) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the <u>jurisdiction of the</u> District of _____ Columbia _____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

18 U.S.C. § 981(a); 18 U.S.C. § 982(a); and 28 U.S.C. § 2461(c) (describe the property):

All funds in two bank accounts held at Renasant Bank pursuant to 18 U.S.C. 981 as further described in the Affidavit and Attachment A, which are incorporated herein by reference.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

❐ Continued on the attached sheet.

DARIUSH J VOLLENWEIDER

Digitally signed by DARIUSH J VOLLENWEIDER
Date: 2020.04.10 10:29:03 -05'00'

*Applicant's signature*

Dariush Vollenweider, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    04/10/2020

*Judge's signature*

City and state:   District of Columbia

Deborah A. Robinson, U.S. Magistrate Judge

*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| ALL FUNDS IN TWO BANK | ) | Case No.   20-sz-29 |
| ACCOUNTS HELD AT RENASANT | ) | |
| BANK PURSUANT TO 18 U.S.C. 981 | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____jurisdiction of the_____ District of _____Columbia_____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:
All funds in two bank accounts held at Renasant Bank pursuant to 18 U.S.C. 981 as further described in the Affidavit and Attachment A, which are incorporated herein by reference.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before _____04/24/2020_____
*(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m.          ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge _____Deborah A. Robinson_____ .
*(name)*

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ❑ for _____ days *(not to exceed 30)*.

❑ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____04/10/2020_____          _____
*Judge's signature*

City and state:     District of Columbia          _____Deborah A. Robinson, U.S. Magistrate Judge_____
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: 20-sz-29 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

Pursuant to this warrant, Renasant Bank shall immediately effect the seizure of the property in Account Number 8011554948, held in the name of Davis Lawyers LLC Escrow Account For The Benefit Of The Encore Health Group LLC ("Target Property 1"); and Account Number 8016909531, held in the name of The Encore Health Group LLC ("Target Property 2"), and provide the property to the law enforcement officer serving the warrant, in a reasonably practicable manner.  The bank shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.

For a period of 14 days (including weekends) after execution of this warrant, the bank shall seize all transactions for the accounts identified above. The bank shall not reject or deny transactions by the subject parties during this time period.

Specifically, the bank is to continue to take in all deposits into the accounts, including deposits of checks and cash, interest, dividends, transfers and wires in.

For this 14-day period, the bank **shall not** process any debit transactions, transfers out, or wires out from these account(s).

Following the expiration of the 14-day period, the bank shall immediately effect the seizure of any property collected during this time period via the above directives, and provide such property to a designated law enforcement officer.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF ALL FUNDS IN TWO BANK ACCOUNTS HELD AT RENASANT BANK PURSUANT TO 18 U.S.C. 981** | **CASE NO. 20-sz-29**<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Dariush Vollenweider, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a seizure warrant for all funds in two bank accounts at Renasant Bank (the "Target Properties"), further described as: Account Number 8011554948, held in the name of Davis Lawyers LLC Escrow Account For The Benefit Of The Encore Health Group LLC ("Target Property 1"); and Account Number 8016909531, held in the name of The Encore Health Group LLC ("Target Property 2").  There is probable cause to believe that the Target Properties are subject to seizure and forfeiture as described herein.

2.      I am a Special Agent with Homeland Security Investigations ("HSI"), and have been so employed since March 2010.  Since becoming a Special Agent, I have participated in numerous investigations into suspected fraud and money laundering.  I am currently assigned to Resident Agent in Charge, Baton Rouge, Louisiana.  As a special agent, I attended approximately 26 weeks of special agent training at the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia, in various aspects of criminal investigations dealing specifically with criminal law, criminal tax law, money laundering, wire fraud, seizure, and various financial investigative techniques.  I have training and experience in the enforcement of the laws of the United States, including the preparation, presentation, and service of arrest, search and seizure warrants.

1

3.     The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, and through a review of reports from other officials and reliable cooperating individuals.

4.     Because this affidavit is submitted for the limited purpose of securing authorization for seizure warrants, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish probable cause.

5.     On April 10, 2020, this Court issued an arrest warrant for CHRISTOPHER PARRIS ("Parris"), after finding that there was probable cause to believe that Parris had committed violations of 18 U.S.C. § 1343 (wire fraud).  The investigation has further revealed that there is probable cause to believe that Parris has laundered monetary instruments, in violation of 18 U.S.C § 1956(a)(1)(B)(i), (a)(2)(A), and (a)(2)(B)(i).  Thus, there is probable cause to believe that the Target properties are:

      a.  subject to criminal and civil seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) as proceeds of a violation of 18 U.S.C. § 1343; and

      b.  subject to criminal and civil seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) as property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(A), and (a)(2)(B)(i), or any property traceable to such property.

**STATUTORY BACKGROUND**

6.     This application seeks a seizure warrant under both civil and criminal authority, because the Target Properties could easily be placed beyond process if not seized by a warrant.

The **Target Properties** are electronic funds, which are liquid and fungible.  I am aware that financial institutions in the past have release funds even when a restraining order was in place. The **Target Properties** are currently held in accounts frozen at Renasant Bank, pending a seizure warrant.

7.      Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 is subject to civil and criminal forfeiture.

8.      Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  Rather, these forfeitures encompass all property "involved in" the crime, which can include untainted or legitimate funds that are comingled with tainted funds derived from illicit sources.

9.      18 U.S.C. § 984 provides that, in any civil forfeiture action in which the subject property is cash or funds deposited into a financial institution, the government does not have to identify the specific property involved in the offense that is the basis for the forfeiture; it is no defense that said property has been removed and replaced by identical property; and identical property found in the same account as the property involved in the forfeiture offense is subject to forfeiture.  In essence, 18 U.S.C. § 984 allows the government to seize for civil forfeiture identical property found in the same place where the "guilty" property had been kept.  However, 18 U.S.C. § 984 does not allow the government to reach back in time for an additional period; a forfeiture

3

action against property not directly traceable to the offense that is the basis for the forfeiture cannot be commenced more than one year from the date of the offense.

10.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture.  18 U.S.C. 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding).  21 U.S.C. 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.  Thus, seizure warrants may be obtained outside of the district where the property to be seized is located.  As discussed more fully below, acts or omissions giving rise to forfeiture occurred within Washington, D.C.

C.     National Emergency for Pandemic

11.     On March 13, 2020, the President of the United States declared a national emergency due to the COVID-19 pandemic.

12.     On March 18, 2020, the President of the United States issued Executive Order 13910, which was titled "Preventing Hoarding of Health and Medical Resources to Respond to the Spread of COVID-19."  In the Executive Order, the President delegated authority to the Secretary of Health and Human Services to designate materials as scarce in order to prevent hoarding under the anti-hoarding provision (50 U.S.C. § 4512) of the Defense Production Act.  That provision, in conjunction with the penal provision in § 4513, states that "no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been

designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation."

13.     On March 25, 2020, the U.S. Department of Health and Human Services issued, "Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950."  In the notice, it designates the following items, among others, as scarce materials:

- N-95 Filtering Facepiece Respirators, including devices that are disposable half-face-piece non-powered air-purifying particulate respirators intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates;
- Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory;
- protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181;
- Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges;
- Powered Air Purifying Respirator (PAPR);
- Portable Ventilators, including portable devices intended to mechanically control or assist patient breathing by delivering a predetermined percentage of oxygen in the breathing gas;
        . . .
- Medical gowns or apparel, e.g., surgical gowns or isolation gowns;
- Personal protective equipment (PPE) coveralls, e.g., Tyvek Suits;
- PPE face masks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels;
- PPE surgical masks, including masks that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials;
- PPE face shields, including those defined at 21 CFR 878.4040 and those intended for the same purpose;
        . . .
- Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators (collectively referred to as "ventilators"), ventilator tubing connectors, and ventilator accessories as those terms are described in FDA's March 2020 Enforcement Policy for Ventilators and Accessories and Other Respiratory Devices During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency located at https://www.fda.gov/media/136318/download.

14.     The 3M Company ("3M") is a U.S. corporation that manufactures items in the field of industry, consumer goods, worker safety, and healthcare.  In response to the current COVID-19 pandemic, the following 3M products are in high demand worldwide and designated as scarce as described above: (a) 3M Particulate Respirator, Model 8210, with N95 NIOSH approved rating; and (b) 3M Disposable Respirator, Model 1860, with N95 NIOSH approved rating.

## PROBABLE CAUSE

A.     <u>Background on Parris</u>

15.     Based on public records and discussions with other law enforcement personnel, I know that Parris is an individual with ties to Rochester, New York, who currently resides in Atlanta, Georgia.

16.     On January 22, 2020, Parris was arrested on a federal criminal complaint issued by a judge in Rochester, New York.  The complaint charges Parris with money laundering and fraud conspiracy violations for allegedly running, along with co-conspirators, a Ponzi scheme lasting from 2008 until 2018, which involved Parris obtaining over $115 million from deceived investors.

17.     According to the FBI case agent's affidavit in support of the criminal complaint, the conduct in that case involved Parris and a co-conspirator purchasing businesses from established investment advisors and brokers who were looking to exit their businesses.  Parris would then take over the investment relationship with the clients of those investment advisors—many of whom had years of established, trusting relationships with the clients.  Parris and his co-conspirator then made misleading representations and promises in order to obtain from those clients new investments into businesses secretly controlled by Parris and his co-conspirator that had no *bona fide* business activity.  Parris would then use the investments to pay off earlier

investors and to divert the funds for other illegitimate uses.  Parris is currently on pretrial release in that case, W.D.N.Y. No. 20-MJ-4019.[1]

    B.    Company A's Solicitation of the U.S. Department of Veterans Affairs

    18.    Company A is a corporation organized under the laws of the State of Louisiana and based in Baton Rouge, Louisiana.  Company A was founded by Person A and purports to sell numerous types of industrial and safety supplies to private firms and government.  Company A's most recent corporate report to the State of Louisiana lists Person A as the president and Person B as the registered agent, secretary, and treasurer.

    19.    On the morning of Monday, March 23, 2020, Person B called a VA official with responsibility over vendor relations.  Person B told the VA official that Company A had 90 million 3M masks that the VA could purchase.  The VA official got the impression from Person B that Company A had the masks on hand in a warehouse.  At the time of the call, Person B was located in Baton Rouge, Louisiana and the VA official was located at his office in the District of Columbia.

    20.    After the call, also on Monday, March 23, 2020, Person B emailed the VA official. Person B wrote the following:

> It was a please to speak with you this morning.  Attached is list of PPE that [Company A] has available for purchase.
>
> I look forward to hearing from your procurement group.
>
> The price for ventilators will follow soon.

---

[1] The fact that Parris has been charged with another fraud-related offense is not, in and of itself, pertinent to probable cause.  We include this information because, as explained below, Parris's underlying case is relevant to establishing his identity and because the charged conduct in that case is sufficiently similar to the conduct in this case that it is relevant to his plan, intent, and modus operandi.  *See* Fed. R. Evid. 404(b).

21.     Person B attached a quote, which was dated March 23, 2020, and showed the purported availability of the products valued at approximately $1,458,500,000.  The list consisted of the following items:

| ITEM | QTY | Description | UOM | Unit Price | Delivery (working days) ARO |
|---|---|---|---|---|---|
| *1* | 90M | 3M 8210 FACE MASK | EA | $7.25 | STOCK |
| *2* | 100M | 3M 1860 FACE MASK | EA | $7.50 | STOCK |
| *3* | 1.5M+ | PLASTIC FACE SHIELDS | EA | $2.50 | STOCK |
| *4* | 1M | GOWNS LONG SLEEVE (ONE SIZE FITS MOST) | EA | $4.75 | STOCK |
| *5* | 1M | SURGICAL 3 PLY MASK | EA | $0.75 | STOCK |
| *6* | 1M | SURGICAL GLOVES (BOX OF 100) | EA | $22.50 | STOCK |
| *7* | 1M | CHEM SUITS CAT 3,4 5 OR 6 | EA | $18.75 | STOCK |
| *8* | 10K | VENTILATORS (WILL ADVISE PRICING SOON) | EA | $0.00 | STOCK |
| *9* | 1M | FACE MASK KN95 | EA | $5.50 | STOCK |

22.     Continuing on Monday, March 23, 2020, Person A called the VA official at his office in the District of Columbia. Person A was located in Baton Rouge, Louisiana, at the time of the call and said that Company A was a reputable business with a 35-year track record, which received awards for their efforts surrounding Hurricane Katrina.  The VA official told Person A that the prices of the masks were too high.  Person A responded he was not price gouging, but simply asking for a fair markup based on what they had paid.  Person A offered to show the VA official "his books" for verification.

23.     On Tuesday March 24, 2020, Person B called a VA official who has responsibility over procurement.  Person B provided pricing for "3M 1860" masks at $7.50 per unit.  The VA procurement official asked for the price to be reduced because 3M-contracted companies, at that time, sold the same masks for $.50 per unit.  Person B told the VA procurement official that Company A purchased the masks close to the offered price so they could not reduce the quote.

8

24.     Continuing on Tuesday March 24, 2020, at 4:22 p.m., Person B emailed the VA procurement official and wrote the following:  *"Attached is the pricing for the ventilators as requested.  There are currently 150ea of this model on the ground."*  Person B attached another Company A quote to the VA vendor relations official.  The new quote was similar to the previous quote, and showed the availability of the products valued at approximately $1,807,300,000.  The list consisted of the following items:

| ITEM | QTY | Description | UOM | Unit Price | Delivery (working days) ARO |
|---|---|---|---|---|---|
| 1 | 90M | 3M 8210 FACE MASK (MINIMUM ORDER 5M) | EA | $7.25 | STOCK |
| 2 | 100M | 3M 1860 FACE MASK (MINIMUM ORDER 5M) | EA | $7.50 | STOCK |
| 3 | 1.5M+ | PLASTIC FACE SHIELDS | EA | $2.50 | STOCK |
| 4 | 1M | GOWNS LONG SLEEVE (ONE SIZE FITS MOST) | EA | $4.75 | STOCK |
| 5 | 1M | SURGICAL 3 PLY MASK | EA | $1.55 | STOCK |
| 6 | 1M | SURGICAL GLOVES (BOX OF 100) | EA | $22.50 | STOCK |
| 7 | 1M | CHEM SUITS CAT 3,4 5 OR 6 | EA | $18.75 | STOCK |
| 8 | 10K | VENTILATORS AS PER ATTACHED SPEC SHEET | EA | $33,750.00 | STOCK |
| 9 | 1M | FACE MASK KN95 | EA | $5.00 | STOCK |
| 1 & 2A | 2M | GENERIC N95 MASK | EA | $5.50 | 2-DAYS |

25.     On Wednesday, March 25, 2020, at 10:57 a.m., Person B emailed the VA procurement official.  Person B inquired on the status and sought to see if there were specific needs of the VA that could be fulfilled by Company A.  The VA procurement official responded to Person B asking where the items could be inspected for authenticity and quantity verification.

26.     On Wednesday, March 25, 2020, at 11:12 AM, Person B emailed the VA procurement official and wrote:

*The inventory for the Mask (3M 1860 N95) and Ventilators are outside the US which can be airshipped into the US in a day. We can obtain video confirmation that this is on the ground and send to you. If you go with the generic N95 they will*

*be made in 2-days and shipped to US.  All ground inventory is moving quickly, this is my reason for the follow up.*

C.    <u>Undercover Communications with Company A</u>

27.    On Friday March 27, 2020, the VA OIG conducted monitored recorded telephone calls to Company A.  A VA OIG special agent acting in an undercover capacity ("UC-1") spoke with Person B.  Person B said Company A could only come down in price to $7.13 per mask for both 3M 8210 and 1860 models with a minimum purchase of one million units.  Person B said 3M manufactures these masks all over the world, however, the units proposed for sale to the VA would be manufactured at 3M production plants in California and Illinois.  According to Person B, these 3M manufacturing plants previously produced other 3M products but have been retooled to produce respirator masks.  Person B also offered non-3M branded generic masks with N95 certification for $5.50 per mask, and said he could deliver one million per day.

28.    Beginning on Wednesday March 25, 2020, a U.S. Department of Homeland Security Investigations (HSI) agent acting in an undercover capacity ("UC-2") contacted Person B via email.  UC-2 purported to be a procurement specialist with the State of Louisiana and wrote Person B seeking 3M-brand 8210 model N95-certified respirator masks and other medical supplies.

29.    On Thursday March 26, 2020, Person B responded to UC-2.  Person B wrote the following:

*I have attached a list of goods [Company A] has offered and sold to the [Louisiana] State Office of Emergency Preparedness.  These are the basic items that we believe are in most need.*

*Keep in mind that we also have ventilators, cots, and are currently waiting for a shipment of boot covers and gloves which we can offer as well.*

*We are one the few major suppliers who can place large orders the 3m 8210 Mask and get them directly from the manufacturing line.*

*I have also copied in the President . . . of our company who has extremely assertive and also instrumental in helping the State of Louisiana get the required medical supplies needs.*

*Any other product list you may have will be beneficial.  Our vast sourcing capacity worldwide will be able to get these requirements quickly and efficiently.*

*Attached are some Purchase Orders already fulfilled by Industrial Supply in this time of crisis.*

30.     Attached to Person B's email to UC-2 were three purchase orders from the State of Louisiana, Governor's Office of Homeland Security & Emergency Management (GOHSEP), dated March 20, 22, and 24, 2020, showing purchases of $7,361,000 of supplies from Company A.  The medical supplies included 160,000 units of purported 3M-brand, 1860 model respirator masks; Haylard KN95 respirator masks; chemical suits; face shields; surgical three-ply masks; and gowns.  The spreadsheet of items Person B said are "most in need" contained 24 line items of medical supplies with availability and some pricing.  Most of the Company A offered items are on the March 25, 2020, U.S. Department of Health and Human Services list of items designated as scarce materials—including surgical masks, N95 masks, isolation gowns, face shields, gloves, Tyvek suits, medical gowns or apparel, and sanitizing and disinfecting devices.

31.     On Thursday March 26, 2020, Person B emailed UC-2 stating, "The 3M 8210 N95 mask will either come from California or Illinois 3M manufacturing facility."

32.     Later on Thursday, March 26, 2020, UC-2 responded with the following:

*Thank you for your phone call and follow up email. When i draft my responses to my higher ups I need to make sure I do it correctly. We are concentrating on supplying all of our outlying facilities to include all of our walk in clinics. Is there anyone locally who has a shipment coming or recently got a shipment that I can put my hands on the mask to make sure they are exactly what we need. Our office just made a purchase from a bad actor and as you would imagine all kinds of people are soliciting the sale of these items. They want to make sure we are getting the right 3M respiratory mask. Its unfortunate but it is what it is.*

*I have been told they want us to purchase 3-5 million mask.*

*Also the 3M 8210 and 1860 are $7.25 per mask correct?*

33.     On Thursday, March 26, 2020, Person B emailed UC-2, responding with the following:

*Thank you for the follow up.  The below pricing structure is correct.*

*3M 8210 and 1860 are $7.25*

*I will have samples of the 3M 1860 here within the next couple of days.*

*Rest assured these mask are new and manufactured at a 3M facility.  The shipments will originate from either the California or Illinois 3M manufacturing plant.*

*I will try to get a 3M 8210 sample as well.*

*Below are pictures of the actual mask.*

34.     The photographs contained in Person B's email depicted: (a) 3M Particulate Respirator, Model 8210, with N95 NIOSH approved rating; and (b) 3M Disposable Respirator, Model 1860, with N95 NIOSH approved rating.

35.     On Thursday, March 26, 2020, Person B emailed UC-2: "I wanted to send the quote for the ventilators so you can have this on file."  Two attachments depicted a specification sheet for a RCS1600 ICU Ventilator and a Company A quotation of 150 ventilators priced at $33,750 each.

36.     On Friday March 27, 2020, Person B emailed UC-2 with the following:

*Good morning.  The timeline once a PO is placed for either the 3M 8210 and 1860 is 1 week delivered to your door.*

*A qty of 1 million minimum is required to proceed with manufacturing.*

*We still have 750K of the 3M 1860's that are stock on the ground.  Obviously 1M is required to purchase these.*

*Terms seem acceptable.*

37.     Later on Friday, March 27, 2020, UC-2 emailed Person B, stating, "So we can send someone to your location in Baton Rouge to pick up 750,000 mask?"

38.     On Friday March 27, 2020, Person B responded to UC-2.  Person B wrote, "The mask will be shipped to my office. 2-3 days." Later on Friday March 27, 2020, Person B again emailed UC-2.  Person B wrote: "Just to reiterate, the 750K – N95 3M 1860's mask are in stock at the distribution warehouse."

D.     State of Louisiana's Purchase from Company A

39.     Around the time of the events described above, an HSI agent interviewed an administrative official at GOHSEP.  That administrative official confirmed her office's purchase orders worth $7,361,000 from Company A.

40.     State of Louisiana GOHSEP provided copies of the invoices they received from Company A via the U.S. Postal Service.  The two letters were postmarked March 23, 2020.  Inside two letters contained invoices to State of Louisiana GOHSEP for the medical supplies listed above.

41.     However, the State of Louisiana has only received, as part of the order, approximately 40,000 chemical suits for $794,000 and no other items.  The 160,000 units of 3M-brand, 1860 model masks have not arrived.  In other words, the State of Louisiana expected to be in possession of 160,000 masks for its emergency response efforts that it does not have.

E.     Parris Revealed as the Source of Company A's Representations and Parris Makes Numerous Misrepresentations to Undercover VA OIG Agents

42.     On or around Wednesday, April 1, 2020, two events occurred that revealed Parris as the source of the apparent incorrect representations being made by Company A.  First, during a phone call between UC-1 and Person B, during which UC-1 asked for more information about Company A's supplier, Person B invited UC-1 to call the supplier.  Person B told UC-1 that

Company A's supplier was Encore Health Group and provided Parris's name and phone number. The phone number Person B provided for Parris matches the phone number Parris provided to law enforcement when he was booked on federal charges in the Western District of New York (*see* Paragraph 16).

43.     Second, prior to anyone from the government contacting Parris, Parris attempted to contact the VA.   On April 1, 2020, Parris called a person whom he believed to be a VA procurement employee in the District of Columbia with a 202 area code, but who was in fact UC-1 located in Louisiana.  Parris identified himself using his real name and said he was referred to the VA by Person B.   Parris represented that he worked for Encore Health Group ("Encore Health"), which he claimed had locations in Atlanta and North Carolina.  Parris said Encore Health acquires and produces PPE and ventilators, and further stated that Encore Health has the ability to produce materials in one to two weeks.  Parris stated to UC-1 that Encore Health buys directly from 3M and other suppliers based on the demands of the customer.

44.     FBI Special Agent Kristin Gibson, who investigated the case against Parris in the Western District of New York and is familiar with Parris's voice, listened to a recording of this telephone call with the person purporting to be Parris.  Agent Gibson confirmed the person in the recorded calls in this case is the same Parris who is on pretrial release in the case pending in the United States District Court for the Western District of New York (*see* Paragraph 16).

45.     Later that same day, the VA OIG received an email from Parris using the email address cparris@theencorehealthgroup.com.mx.  Parris wrote:

> *Please see the attached document with our credentials, just wanted to also let you*
> *know that this will not be our first time working with the VA.*

46.     Attached to Parris's email to the VA OIG was a brochure for a different company, Company B.  The brochure contained a list of U.S. government contracts and listed Company B's website.  The brochure did not contain any information about Encore Health.

47.     To investigate whether there was a link between Company B and Encore Health, UC-1 initiated an undercover phone call with Person C, Company B's owner.  During the call, Person C stated that Parris had worked in a sales capacity with Company B and that Company B had done business with the VA in the past.  Person C acknowledged to UC-1 that the mask supply chain had been "destroyed" by the pandemic and acknowledged that Company B's own mask supply was a source in Turkey—not 3M.  Person C further acknowledged that, as a general matter, the VA would not purchase masks at the exceedingly high prices at which he was able to obtain masks.

48.     On Thursday, April 2, 2020, UC-1 emailed Parris with a list of items sought by the VA to include 125 million 3M brand, 1860 model number masks, as well as smaller quantities of ventilators and other PPE.  Most of these items are on the designated list of scarce materials.

49.     On Thursday April 2, 2020, Parris called UC-1 again.  Parris said he had a rare occurrence, having obtained an allocation of 3M brand, 1860 model masks.  Parris stated that the masks were "on the ground" and his team was inspecting them.  Parris said this product gets in, then it is gone, and wanted to see if or when the VA had a timeframe to take action to procure items.

50.     On Friday April 3, 2020, Parris called UC-1 three times throughout the day.  In those calls, Parris asked if the VA wanted 750,000 masks or 125,000,000 masks, claiming that the larger the acquisition would be easier to obtain.  Parris also claimed:

- That he was checking on a price point for the 3M-brand 1860 model masks;

15

- That he could probably offer the masks at a price between $6 and $6.50;

- That he has sold to the states of Louisiana, Massachusetts, and Rhode Island.  Parris said he deals in tranches of 50-150 million masks;

- That he would need a commitment of 25 million masks to trigger the process.  Parris said that Encore Health consistently does nine-figure deals; and

- That he was awaiting pricing from the ventilator manufacturer.

51.     In the third call Parris placed to UC-1 on April 3, 2020, Parris attempted to apply a high-pressure sales tactic by asking whether the VA could skip the escrow phase and "close" the deal directly.  More specifically, Parris asked whether the VA's policies would allow a direct payment at the time of closing with that payment going into an escrow fund.

52.     Later on Friday April 3, 2020, Parris wrote an email to UC-1, attaching a completed vendor form:

> *Good evening, just wanted to return this application. As discussed, I'm just waiting on the amended price for the ventilators to be able to submit our invoice, and they will have an answer for us by tomorrow a.m. I will reach out to you then, have a great evening.*

53.     The attachment provided by Parris to his email was a signed VA Form 10091, FSC Vendor File Request Form.  The form contained information for Company B, Person C, and a bank account for Person C.  The form was dated March 20, 2020, contained Person C's physical signature, and Person C's digital signature dated April 30, 2019.

54.     Also, on April 3, 2020, agents from HSI (not in an undercover capacity) went to Company A's offices in Baton Rouge and interviewed Person A and Person B.  Person A and Person B confirmed that the transaction Company A brokered with the State of Louisiana called for Encore Health and Parris to supply the subject PPE.  Person B explicitly verified that the representations Company A made to the State of Louisiana about 3M mask availability and

16

location came directly from Parris, and that Parris claimed to Person B that he had the capacity to obtain supply from 3M.

55.     Person A and Person B also revealed that Company A had wired Parris more than $4 million as an upfront payment to secure the transaction for the State of Louisiana.

56.     Subpoena returns from Renasant Bank confirmed the two related wires ($3,865,000 and $250,000) on March 30, 2020 totaling $4,115,000 on the behalf of the State of Louisiana to Encore Health's bank account, that is, **Target Property 1**.

57.     Person B agreed to make phone calls to Parris that would be recorded by agents. On the first of those phone calls, on April 3, 2020, Parris stated to Person B that the inventory of masks that was to be sent to the State of Louisiana was not actually obtained and that Parris was attempting to source masks from other tranches.  Parris referred to masks in Dallas and Dubai, and also stated that he was obtaining masks for Rhode Island and Massachusetts.  (Due to the exigency and sensitivity of the undercover operation, agents have not been able to confirm whether Parris actually attempted to sell masks or other PPE to Massachusetts or Rhode Island.  However, bank account records obtained as part of the investigation do not reflect payments made by the Rhode Island or Massachusetts.)  These representations were contrary to the representations that Parris had previously made to Company A about mask availability.

58.     Person B placed a second monitored phone call to Parris shortly thereafter.  On that phone call, also on April 3, 2020, Person B asked Parris to obtain masks directly from 3M in order to fulfill the order for the State of Louisiana.  Parris agreed to obtain masks directly from 3M in 72 hours and stated that they would pursue "the traditional path" and "give up on the warehouse game."

59.     Approximately 72 hours later, on Monday, April 6, 2020 around 11:20 a.m. Central time, Parris sent an email to Person B and stated, among other things, that he could not obtain actual 3M masks to fulfill the pre-existing State of Louisiana order.  Instead, Parris offered to substitute generic masks, refund Company A's money, or continue to pursue 3M masks that he said would be difficult to obtain.

60.     Later on April 6, 2020, Company A informed Parris that it would like to be refunded its money for the mask purchase.  After numerous requests from Company A, Parris provided documentation reflecting that he initiated a wire transfer refund of approximately $1 million from **Target Property 1** to Company A for the failed mask purchase.

61.     However, half of the $4 million PPE order for the State of Louisiana has still not been fulfilled, and Parris has failed to provide tracking information to Company A about when those promised items might arrive.

F.     <u>Parris's Offer to the VA</u>

62.     Less than two hours after informing Person B that he could not obtain 160,000 3M masks for the State of Louisiana, at approximately 1:10 p.m. on April 6, 2020, Parris claimed to UC-1 that he could obtain 125 million 3M masks for the VA at $6.45 per mask.  Specifically:

> *VA OIG Agent:  I just wanted to confirm a ballpark estimate for the 3M masks we were talking about last week, the 1860 [model].*
>
> *Parris:  Oh remember I told you, I'm going to get that below $6.50.  If you have to give them a number now, give them $6.45.*
>
> *VA OIG Agent: Ok, $6.45 for the 1860s and that's probably a good quote for all 125 million of that allocation?*
>
> *Parris:  That sure is.*

On the same call, Parris discussed the possibility of obtaining non-3M-brand masks, but the VA OIG agent stated that the government preferred 3M masks because, among other things, they are

manufactured in the United States.  Parris replied, "Say no more," and stated that he could procure 3M masks from domestic sources

63.     On April 7, 2020, Parris placed another phone call to UC-1.  In the phone call, Parris said that he had "gotten everything aligned" for the mask purchase, and asked the VA to provide a "proof of funds" to ensure that the VA had the money to complete the mask purchase. UC-1 responded that the VA would review his request and that such a proof of funds was likely possible.

64.     On April 8, 2020, Parris emailed UC-1 and asked to whom the VA invoice should be addressed, indicating his ongoing willingness to enter into the 3M N95 mask transaction.  After UC-1 responded with that information, Parris emailed UC-1 a formal proposal for a purchase of 125 million 3M masks.  The invoice was for $30.75 million for five million 3M masks as "phase one" of the purchase.  The terms of the deal required the VA to provide 10 percent of the "phase one" money, or $3.075 million, as an upfront payment.

G.      Parris-Related Solicitations to the State of California

65.     On April 7, 2020, agents spoke with a procurement official with the State of California and have discovered that a Parris-related entity made solicitations to sell over $40 million of PPE (including N95 respirator masks) to the State of California at the end of March 2020.

66.     According to emails obtained from the State of California, a purported medical supply company approached a California procurement official via email, copying Parris via email, and solicited a large order of PPE.  The State of California became suspicious of fraud when the wiring instructions for the order did not match the medical supply company soliciting the order, but instead were for an Encore Health Group escrow account.

67.     The State of California declined to go through with the purchase.

H.      Information from 3M

68.     A senior lawyer for 3M has also provided information related to this investigation. This information casts strong doubt on many of the key representations made or caused to be made by Parris.

69.     3M's counsel related that the $7.25 price offered for a 3M mask is an extremely high price.  3M's counsel related that 3M has not increased its price of the 3M N95 style masks. 3M respirator masks typically retail for $.60 to $1.20 per item.

70.     3M's counsel stated that 3M does not manufacture any N95 masks at California and Illinois locations.  Specific to the United States, 3M's counsel stated that 3M manufactures respiratory masks in Nebraska and South Dakota.  3M's counsel stated that 3M masks are manufactured at other international locations.

71.     3M's counsel stated that it is simply not possible for "anyone" to obtain five million 3M respirator masks in the current climate of the COVID-19 pandemic.  3M's counsel stated that no legitimate channel partner of 3M would have five million respirator masks.  3M's counsel stated that 3M is working closely with worldwide government agencies to allocate respirator masks to areas of the highest need.

72.     3M's counsel also stated that Encore Health Group is not a 3M partner and that, upon review of 3M databases, 3M does not sell N95 masks to Company B, Parris, or Encore Health Group.

I.      Financial Analysis

73.     Subpoena returns from Renasant Bank further corroborated the above-described scheme by Parris.

74.     Between March 25 and April 7, 2020, **Target Property 1** received approximately $7,438,485 in incoming wires.  As noted above, $4,115,000 of these incoming wires related to the purchase of PPE on behalf of the State of Louisiana.  Much of the remaining wires appear to similarly come from entities who had reason to purchase PPE during the national pandemic.  For example:

a.  On March 25, 2020, Company C wired $1,800,000 to Encore Health at **Target Property 1**.  According to Company C's website, it is health care insurance company.  Company C's website further indicates that it is providing resources to health care providers during the pandemic.  One document on their website highlights the need for PPE for healthcare providers.  I am aware that health care providers and their support networks are attempting to find PPE for health care employees, as they are exposed to ill individuals on a near constant basis.

b.  On April 3, 2020, Company D wired $226,500 to Encore Health at **Target Property 1**.  According to Company D's website, it has been deemed an essential business by the Governor of New York, and thus remains open for business. Company D's website explicitly states that all personnel "are masked and gloved at all times," indicating that they likely were in need of PPE for their employees.

c.  On April 3, 2020, Company E wired two payments totaling $213,766 to Encore Health at **Target Property 1**.  According to Company E's website, it is a health care provider that supports wound care clinics.

75.     Between March 31 and April 8, 2020, **Target Property 1** sent out approximately $3,915,938 in outgoing wires.  As noted above, there was a $1,000,000 outgoing wire refund related to the purchase for the benefit of the State of Louisiana, which partial refund occurred after

Parris failed to deliver promised goods.  Much of the remaining outgoing wires appear to track known money laundering patterns and practices.  For example:

      a.   On March 31, 2020, Farris caused **Target Property 1** to wire out a payment of approximately $22,500 to Company F in Taiwan.  According to publicly available Taiwanese business records, Company F is in the business of selling spare parts and accessories for vehicles. I know from my training and experience, that payments to/from counterparties in seemingly unrelated industries is a red flag for money laundering.  This payment here bears such hallmarks, as the payment to an auto repair company in Taiwan is a seemingly unrelated industry to the provision of PPE.

      b.   On April 6 and 8, 2020, Farris caused **Target Property 1** to wire out three payments totaling approximately $1,132,400 to Company G's Swiss bank account. According to publicly available Swiss incorporation records, Company G is a Swiss financial institution. Company G has no website and only nominally referenced on the internet.  Based on my training and experience, this is a red flag indicator for a shell company.  In today's modern global economy, businesses, particularly financial institutions, have a presence on the internet to attract customers and describe their business.  Moreover, it appears that numerous other companies claim the same address as Company G, which is another indicator for a shell company.

76.    **Target Property 1** has an approximate current balance of $3,092,502.12.

77.    Subpoena returns further revealed that on October 17, 2019, Parris opened **Target Property 2** at Renasant Bank in the name of Encore Health.  Between February and March 2020, **Target Property 2** received approximately $825,775 in incoming deposits.  The deposits into **Target Property 2** appear to further be part of the above-described scheme.  For example:

a. The subpoena returns revealed that the primary source of such deposits were large cashier's checks, with no associated reference to the source of the funds.  I know from my training and experience that persons engaged in fraud often cash out funds in other account into cashier's check and they "layer" such proceeds of their criminal activity into other accounts.  The deposits observed here are consistent with such scheme.

b. One of the largest other sources of deposits was a wire on March 20, 2020, from Company H for approximately $300,000 to Encore Health at **Target Property 2**.  According to public incorporation records, Company H is registered in Texas.  The documents list no purported line of business.  Company H has no website and only a minimal footprint on the internet.  As noted above, this is consistent with the operation of a shell company.

78.     **Target Property 2** has an approximate current balance of $176,969.00.

## CONCLUSION

79.     I am aware that pervasive criminal wrongdoing by a business obviates the need for tracing in forfeiture actions. That is, when a business is "used as a vehicle to commit fraud" and "that fraud touched everything," all "items connected to [the business's] revenue stream are subject to forfeiture." *United States v. Smith*, 749 F.3d 465, 488-89 (6th Cir. 2014); *see also United States v. Lang*, No. 1:12-CR-104, 2015 WL 4207109, at *2 (E.D. Tenn. July 10, 2015) (finding that when "vast majority" of business's proceeds comes from illegal activity, government can forfeit "entirety" of the proceeds even if the business was not "a wholly illegitimate enterprise") (emphasis added). In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the Sixth Circuit held that "the entirety" of a company's revenue was forfeitable, "including money generated

23

through supposedly legitimate transactions," because even legitimate sales "resulted 'directly or indirectly' from a conspiracy to commit fraud." *Id.* at 332; *see also United States v. Torres*, 703 F.3d 194, 199 (2d Cir. 2012) ("so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense . . . the forfeiture statute envisions and tolerates some attenuation of the chain of events between the crime and the related property or gain it makes subject to forfeiture.").

80.     I note that financial records and witness interviews all lead to the conclusion that the vast majority of Encore Health's transactions are part of the above-described scheme, which is in violation of wire fraud and money laundering laws.  Moreover, pursuant to 18 U.S.C. § 984, tracing is not required as illicit funds noted above were deposited into the **Target Properties** within the last year. As such all funds in the **Target Properties** are subject to forfeiture.

81.     As noted above, funds are coming into the **Target Properties** on frequent and recent basis, and from either suspicious entities or suspected victims.  As such, there is probable cause to establish a virtual dam (detailed in Attachment A) on the account so that any funds that come in 14 days after service of the warrant continue to be held by the exchange.  This Court has approved such damming warrant authority for seizures where funds will continue to be transferred in the future.  *See United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Company, Ltd.*, No. 17-mj-217-DAR-BAH, 2017 WL 3233062, at *1 (D.D.C. May 22, 2017).

82.     Based upon the evidence gathered in this investigation and set out above, I submit that there is probable cause to believe that all funds in the **Target Properties** are subject to seizure and forfeiture, pursuant to the above authorities.

83.     Because the warrant will be served on the financial institutions who currently hold the funds, and thereafter, at a time convenient to it, will transfer the funds to the U.S. government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

84.     Further, I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Seizure Warrant.  In support of this request, I inform the Court that I am currently in Louisiana, where I am working on the investigation of this and other matters.  If I were required to appear before the Court in person, it would be a cost to the United States both in travel costs and time diverted from the substantive investigation.  I submit that staff from the U.S. Attorney's Office are capable of identifying my voice and telephone number for the Court.

Respectfully submitted,

DARIUSH J VOLLENWEIDER
Digitally signed by DARIUSH J VOLLENWEIDER
Date: 2020.04.10 10:29:41 -05'00'

Dariush Vollenweider
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 10th day of April, 2020.

_____
HON. DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE